NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5983-12T4

JACQUELINE SCHIAVO, ZORAYMA
RIVERA, KIMBERLY JOHNSON,
PATRICIA TAYLOR, NOELIA LOPEZ,
CINDY NELSON, LATOYA WILSON,
AMY ASKINS, BRANDI JOHNSON,
TYRIA WILLIAMS, TARA KENNELLY,
AIMEE BARRELLA, JACQUELYN
MCDONNELL, TERRI ESTRADA,
MELISSA WERTHMANN, DANIELLE
LEONARDIS, MORTA VAISYTE,
MARCELLA BOOKER, WENDY GARCIA,
KELLY HIGBEE, and TANIA NOUEL,

    Plaintiffs-Appellants,

and

LATESHA STEWART, MISTY GALE,
ANDREA CIMINO, NANCY CARFAGNO,
NATASHA BUCCERONI, and CAROL
COHEN,

    Plaintiffs,
v.

MARINA DISTRICT DEVELOPMENT
COMPANY, LLC, d/b/a BORGATA
CASINO HOTEL & SPA,

    Defendant-Respondent.

_____

> APPROVED FOR PUBLICATION
>
> September 17, 2015
>
> APPELLATE DIVISION

        Argued February 23, 2015 - Decided September 17, 2015

        Before Judges Lihotz, Espinosa and St. John.

        On appeal from Superior Court of New Jersey,
        Law Division, Atlantic County, Docket No. L-
        2833-08.

Deborah L. Mains argued the cause for appellants (Costello & Mains, P.C., attorneys; Ms. Mains, on the briefs).

René M. Johnson and Russell Lichtenstein argued the cause for respondent (Morgan, Lewis & Bockius LLP, and Cooper Levenson April Niedelman & Wagenheim, P.A., attorneys; Ms. Johnson, Michelle S. Silverman, Mr. Lichtenstein and Gerard W. Quinn, on the brief).

Nancy E. Smith argued the cause for amicus curiae New Jersey Association for Justice (Smith Mullin, P.C., attorneys; Ms. Smith, on the brief).

Angelica M. Cesario argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (The Dwyer Law Firm, LLC, attorneys; Andrew Dwyer, of counsel and on the brief; Ms. Cesario, on the brief).

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

Plaintiffs, twenty-one women who are present or former employees of defendant Marina District Development Company, LLC, operating as the Borgata Casino Hotel & Spa, appeal from the summary judgment dismissal of their complaint alleging violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, as informed by Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.A. §§ 2000e to 2000e-17. Plaintiffs allege defendant's adoption and application of personal appearance standards (the PAS) subjected them to

illegal gender stereotyping, sexual harassment, disparate treatment, disparate impact, and as to some plaintiffs, resulted in adverse employment actions.

The motion judge found the provisions of the challenged PAS, to which plaintiffs specifically consented to abide when accepting employment in defendant's program known as "the BorgataBabes," were reasonable in light of casino industry standards and customer expectations. Therefore, the PAS requirements were permitted by N.J.S.A. 10:5-12(p), a provision allowing an employer to establish reasonable employee appearance standards. Further, the judge rejected as unsupported plaintiffs' assertions of disparate treatment and enforcement between male and female BorgataBabes. Accordingly, he concluded plaintiffs failed to sustain the alleged LAD violations. The judge granted defendant's motions against each plaintiff for summary judgment and dismissed all claims.

On appeal, plaintiffs argue the motion judge inappropriately engaged in factfinding. Further, they challenge his interpretation of N.J.S.A. 10:5-12(p), and maintain the evidence was sufficient to allow a jury to conclude plaintiffs were victims of gender stereotyping, sexual harassment, and disparate impact in contravention of the LAD. Defendant not only refutes these arguments, requesting we affirm the motion

judge's determinations, but also argues plaintiffs' claims are barred by the statute of limitations or, otherwise, precluded by laches and estoppel.

Amici, the National Employment Lawyers Association of New Jersey (NELA) and the New Jersey Association for Justice (NJAFJ), concur with plaintiffs' position summary judgment was prematurely granted. Primarily raising the same arguments as proffered by plaintiffs, NELA and NJAFJ argue the PAS imposed unfair and discriminatory grooming standards on female beverage servers in violation of the LAD by mandating females conform to "stereotypical images of femininity . . . to retain their jobs."

Following our review, we affirm in part and reverse in part. We have considered plaintiffs' claims and conclude all facial discrimination challenges to the PAS are time-barred or unsupported. We also conclude the LAD does not encompass allegations of discrimination based on weight, appearance, or sex appeal. However, we determine the motion judge erred in concluding the record was insufficient to present a prima facie claim of sexual harassment hostile work environment discrimination. Certain plaintiffs, whose lack of compliance resulted from documented medical conditions or post-pregnancy conditions, have presented a material dispute of facts regarding defendant's application of the PAS weight standard resulting in

harassment because of their gender.  As to those claims, summary judgment is reversed and the matter remanded.  As to all other claims, for the reasons discussed in our opinion, we affirm.

I.

In order to provide context to the claims raised in plaintiffs' complaint, we must provide an overview of the BorgataBabes program and the challenged PAS, as amended in 2005. Thereafter, we generally identify the facts asserted to support the various LAD claims, examining together similar allegations of groups of plaintiffs.  In our legal discussion, we recite the standards guiding our review, including the requisites of the LAD and, as appropriate, federal jurisprudence.  Finally, we apply these principles to the facts presented in the record.

A.

"The market in Atlantic City changed forever in 2003 with the opening of the Borgata, the city's first Las Vegas[-]style resort.  The 2,000-room facility was the first casino to open in over a decade and it quickly became the largest grossing property in the city."  A Brief History of the Casino Control Commission, St. of N.J. Casino Control Commission, http://www.nj.gov/casinos/about/history/ (last visited Aug. 30, 2015).  Defendant's business decision to differentiate itself from the existing Atlantic City casinos included the creation of

5

the "BorgataBabes," a specialized group of costumed beverage servers.[1]  The BorgataBabes reflected "the fun, upscale, sensual, international image that is consistent with the Borgata brand" bringing "Las Vegas[-]style to Atlantic City."  All Babes were expected to comply with the "Five Fs": "Fun, Friendly, Focused, Fresh, and Fast."

Defendant's recruiting brochure described its image of the BorgataBabes this way:

> They're beautiful.  They're charming.  And they're bringing drinks.
>
> She moves toward you like a movie star, her smile melting the ice in your bourbon and water.  His ice blue eyes set the olive in your friend's martini spinning.  You forget your own name.  She kindly remembers it for you.  You become the most important person in the room.  And relax in the knowledge that there are no calories in eye candy.
>
> Part fashion model, part beverage server, part charming host and hostess.  All impossibly lovely.  The sensational BorgataBabes are the new ambassadors of hospitality representing our beautiful hotel casino and spa in Atlantic City.  On a scale of 1 to 10, elevens all.
>
> Eyes, hair, smile, costumes as close to absolute perfection as perfection gets. BorgataBabes do look fabulous, no question. But once you can breathe again, prepare to be taken to another level by the BorgataBabe

---

[1]     The parties agree all BorgataBabes were costumed beverage servers, but not all costumed beverage servers were BorgataBabes.

attitude. The memory of their warm, inviting, upbeat personalities will remain with you long after the vision has faded from your dreams.

ARE YOU A BABE?

Of the more than 4000 male and female applicants for approximately 200 placements, the final candidates underwent two rigorous interviews, and a twenty-minute audition in-costume. The audition notification, sent to those who were chosen following the interviews, made clear "[p]ersonal appearance in costume" was one evaluative criteria and the audition required "performing" mock customer scenarios. Chosen candidates were also advised of the PAS requirements, which required male and female Babes be physically fit, with their weight proportionate to height, and display a clean, healthy smile. Female BorgataBabes were to have a natural hourglass shape; males were to have a natural "V" shape with broad shoulders and a slim waist. Women were to have hair that was clean and naturally styled, and tasteful, professional makeup that complimented their facial features. Men were to be either clean shaven or have neatly trimmed and sculpted facial hair. BorgataBabes were to deliver excellent customer service and create a feeling of "upscale classiness, sensuality, and confidence to build customer loyalty." Defendant maintained the PAS was designed to

maximize its ability to maintain and preserve the image defendant seeks to project to the public.

The men and women chosen as BorgataBabes contractually agreed to adhere to these strict personal appearance and conduct standards. The final candidates were sent a notice, which attached the PAS, recited the terms of engagement, and stated: "During your employment, you must maintain approximately the same physical appearance in the assigned costume. You must appear to be comfortable while wearing the assigned costume for which you were fitted."

Defendant viewed the BorgataBabes as "entertainers who serve complimentary beverages to . . . casino customers," "similar to performance artists," who would act as entertainers and ambassadors of the Borgata's "stylish brand of hospitality." BorgataBabes were required not only to serve drinks to customers on the casino floor, but also, on an as-needed basis, would represent the Borgata and appear at special marketing events; be photographed in advertising; perform at player promotions; make radio, television, and media appearances; attend restaurant parties, parades, and designated charity and community events. Defendant considered the BorgataBabes "high-profile entertainment positions [similar to] professional cheerleaders and models — careers which require a certain appearance to

portray a certain image to the public." Starting in 2004, BorgataBabes could voluntarily participate in the "Babes of Borgata Calendar," a marketing publication containing photographs of twelve female BorgataBabes, who were provocatively clad and assumed sexually suggestive poses.

In keeping with its objective to create a Las Vegas-style casino image and atmosphere, employees hired as BorgataBabes wore distinctive, custom-fitted costumes, designed by Zac Posen. All Babes were fitted with costumes issued by defendant's wardrobe department. Unlike other employees, BorgataBabes enjoyed the use of the "Babe Lounge," which was a "private, Hollywood-style dressing room"; an extra forty-five minutes of paid time to change into costume and complete their personal grooming; photo opportunities; gratuitous spa and fitness center access; and reimbursement for gym memberships, nutritionists, and personal trainers.

In late 2004, defendant sought to modify the PAS to interpose a compliance standard which defendant believed would allow it "to enforce the PAS in an objective manner." On February 18, 2005, defendant announced this PAS "clarification" to the original requirement to "maintain approximately the same physical appearance" as when hired. Specifically, the PAS change sought to elucidate the "weight proportioned to height"

standard. Under the modified PAS, barring medical reasons, BorgataBabes could not increase their baseline weight, as established when hired, by more than 7% (weight standard). "[Defendant] selected the 7% standard because it reasonably approximated a change of one clothing size and because it was consistent with the scientific definition of a clinically significant weight gain."[2]

Twenty of the twenty-one plaintiffs worked for defendant prior to the issuance of the clarifying PAS.[3] In February 2005, all BorgataBabes were weighed to establish a baseline. Each of the plaintiffs executed the modified PAS, which included the new weight standard and stated non-compliance with the standard would result in termination. On the document, immediately above each plaintiff's signature, appears this statement, in bold capital letters: "I read and fully understand that costume requirements, personal appearance and weight standard[,] and the

---

[2] A "clinically meaningful" weight loss range is at least five percent. See Susan Z. Yanovski, M.D. & Jack A. Yanovski, M.D., Ph.D., "Long-Term Drug Treatment for Obesity: A Systematic & Clinical Review," 311 J. Am. Med. Assoc., 74-86 (2014), available at http://jama.jamanetwork.com/article.aspx?articleid=1774038.

[3] All plaintiffs but Tyria Williams and Jacquelyn McDonnell were working as BorgataBabes on February 18, 2005. Williams was employed by defendant when the modified PAS was adopted and transferred to and was hired as a BorgataBabe on June 13, 2006. McDonnell was hired on December 3, 2007.

personal grooming standards, as set forth herein, are expectations and ongoing requirements for all costumed beverage servers." Several plaintiffs executed the modified PAS adding the words "under protest." Many testified they believed failure to accept the PAS would evoke termination.

The PAS did not provide a fixed schedule for weigh-ins, such as the first of each month or every quarter. Rather, weigh-ins were "periodic," to occur "including, but not limited to" when a BorgataBabe "requires a costume size change or whenever he/she returns from any leave of absence." Other weigh-ins were arbitrary and occurred when managers from the beverage and talent departments concluded a BorgataBabe's costume was ill-fitting. The PAS explained the procedures followed when an associate exceeded the weight limit, allowing a period for compliance, and detailed consequences and discipline for non-compliance. The PAS also explained that employees could request exceptions from enforcement because of a "bona fide medical condition" or pregnancy.[4]

Much of the deposition testimony of defendant's management employees was devoted to the enforcement of the weight standard

---

[4] For those providing a bona fide medical condition or proof of pregnancy, accommodations such as adjustment of the baseline weight, allowance of additional time to comply with the standard, and medical leave.

in the PAS. Between February 2005 and December 2010, stipulated by all parties as the relevant time period for review, 686 female and 46 male associates were subject to the PAS, of which 25 women and no men were suspended for failure to comply with the weight standard.[5]

B.

On August 20, 2008, Jacqueline Schiavo filed the first complaint challenging the PAS and alleged its enforcement against women as violative of the LAD. Subsequently filed complaints by other plaintiffs were consolidated by the Law Division under the first filed docket number.[6]

---

[5] Latesha Stewart was the only associate terminated for violation of the PAS. She filed a separate action from plaintiffs' action, which was settled. Stewart has not participated in this appeal.

[6] Following Schiavo's filing, substantially similar complaints were filed as follows: Patricia Taylor on September 10, 2008; Kimberly Johnson on September 19, 2008; Zorayma Rivera on September 19, 2008; Noelia Lopez, Cindy Nelson, Latoya Wilson, Amy Askins, and Brandi Johnson on January 8, 2009; Williams joined Lopez, Nelson, Wilson, Askins, and B. Johnson in an amended complaint filed on January 20, 2009; and Tara Kennelly, Andrea Cimino, Aimee Barrella, Jacquelyn McDonnell, Misty Gale, Terri Estrada, Melissa Werthmann, Danielle Leonardis, Morta Vaisyte, Marcella Booker, Wendy Garcia, Carol Cohen, Kelly Higbee, Nancy Carfagno, Natasha Bucceroni, and Tania Nouel on September 22, 2009. Various orders consolidated these matters under the lead docket number of Schiavo's complaint. Further, the consolidated first amended complaint eliminated several of these plaintiffs.

Collectively, plaintiffs object to the PAS weight standard as gender stereotyping and gender role discrimination in violation of the LAD. Further, they allege defendant's sexual harassment and gender stereotyping created a hostile work environment. Individual plaintiffs allege facts asserting LAD violations arising from defendant's administration of the weight standard, maintaining defendant engaged in harassing, sexually suggestive, and gender biased conduct. The underlying facts experienced by each plaintiff are set forth in individual counts of the complaint.

Generally, each of these nine plaintiffs were suspended for different periods when defendant determined each exceeded the 7% weight gain limit: Askins, Garcia, Schiavo, Vaisyte, Higbee, Taylor, Rivera, Lopez, and Nelson. Askins, Garcia, Schiavo, and Vaisyte were suspended, but thereafter complied and remained employed with defendant as of June 2012. In lieu of termination following non-compliance with the PAS weight standard, Higbee and Taylor chose to transfer to a non-PAS position and ultimately separated from employment within a year of transfer. Rivera and Lopez suffered documented medical conditions affecting weight control. Nelson resigned following an inability to meet the PAS weight standard following a pregnancy.

The remaining plaintiffs were never suspended for non-compliance with the PAS. Barrella was given a medical allowance. Booker and B. Johnson experienced post-pregnancy weight gain. Booker returned to compliance, but Johnson resigned when notified she remained out of compliance one-year after her child was born. McDonnell, Werthmann, and Leonardis were found to be non-compliant at times, but each successfully returned to the designated weight range, without suspension. Estrada, K. Johnson, Kennelly, Nouel, Williams, and Wilson at all times met the PAS weight standard.

In addition to the gender stereotyping and harassment claims, plaintiffs allege the PAS weight standard was not equally applied to male BorgataBabes. Plaintiffs' allegations include statements told to them by men who were not weighed or who purchased a black shirt or pants similar to their non-descript outfit to avoid requesting a new costume. A few plaintiffs knew or dated males who were unconcerned with the PAS weight standard and others testified they saw male bartenders who they felt gained weight.

Defendant admits no male BorgataBabe was suspended for non-compliance with the PAS weight standard. The record contains information regarding one male BorgataBabe disciplined when found not wearing the issued costume. Defendant also produced a

chart, summarizing the weighing of male associates, recording baseline weights of forty-three men in February 2005, or their date of hire. The chart also records five male Babes who were reweighed prior to 2008, when this action originated.

The summary judgment record also includes expert reports submitted by plaintiffs and defendant. Dr. Christopher Erath, an economist with a specialized interest in labor economics and econometrics, opined on behalf of defendant "that application of conventional statistical standards and tests yields no statistical evidence consistent with plaintiffs' allegation that the PAS had a disparate impact upon female Costumed Associates." Plaintiffs' expert Dr. Alan J. Salzberg, an economist and statistician, suggested, given the small percentage of male BorgataBabes, the tests performed by Erath were not statistically meaningful.

## II.

We recite the standards guiding our review of a decision granting summary judgment. Further, we provide an overview of the legal principles implicated by the issues raised in this appeal.

## A.

"An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion

judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). We "must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Ibid. See also R. 4:46-2(c).

We consider all facts in a light most favorable to plaintiffs, the non-movants, Robinson v. Vivirito, 217 N.J. 199, 203 (2014), keeping in mind "[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). "The practical effect of this rule is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat, supra, 217 N.J. at 38.

Since the grant of summary judgment calls for a review of the "trial court's interpretation of the law and the legal consequences that flow from established facts," the trial court's decision is "not entitled to any special deference," and is subject to de novo review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A-5983-12T4

B.

We recognize the "major public policy . . . enshrined in the LAD," Alexander v. Seton Hall Univ., 204 N.J. 219, 227 (2010), which proclaims all individuals

> shall have the opportunity to obtain employment . . . without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression . . . , subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
>
> [N.J.S.A. 10:5-4.]

See also N.J.S.A. 10:5-3 (stating Legislature's commitment of state's public interest to eliminate practices of discrimination).

"Without doubt, the LAD 'unequivocally expresses a legislative intent to prohibit discrimination in all aspects of the employment relationship, including hiring and firing, compensation, the terms and conditions of employment, and retirement.'" Alexander, supra, 204 N.J. at 227-28 (quoting Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 106-07 (2010)). "Those commands provide the force underlying the frequent case law refrain that 'the clear public policy of this State is to eradicate invidious discrimination from the workplace.'" Id. at

17

228 (quoting Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 630 (1995)).

"Because of its remedial purpose, the LAD should be construed liberally . . . ." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446 (2005). However, "the LAD acknowledges the authority of employers to manage their own businesses" and "prevents only unlawful discrimination against [protected] individuals . . . ." Ibid. (emphasis omitted).

It is also well-settled that a plaintiff bears the burden to establish a prima facie case showing he or she was a victim of discrimination by an employer. Victor v. State, 203 N.J. 383, 408 (2010). Typically, a prima facie case of employment discrimination based on sex is established when a plaintiff demonstrates by a preponderance of the evidence that he or she (1) is a member of a designated protected class; (2) who was qualified for and performing the essential functions of the job; but (3) suffered termination or other adverse employment action; and (4) others not in the protected class did not suffer similar adverse employment actions. Id. at 409. However, "[t]here is no single prima facie case that applies to all employment discrimination claims. Instead, the elements of the prima facie case vary depending upon the particular cause of action." Id. at 408.

As noted, all plaintiffs allege sexual harassment hostile work environment, disparate treatment, disparate impact, and gender stereotyping. "Identifying the elements of the prima facie case that are unique to the particular discrimination claim is critical to its evaluation." Id. at 410.

The test for hostile work environment sexual harassment claims, irrespective of a defendant's effort to dispute the evidence, requires "a female plaintiff allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993). Restated, the elements of the claim include: "[T]he complained-of conduct (1) would not have occurred but for the employees' gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Ibid. (emphasis omitted).

A claim of discrimination based on disparate treatment generally is analyzed under the framework initially set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668, 677 (1973). First, the plaintiff must establish a prima facie case of discrimination. Id. at

802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677. If successful, a presumption of discrimination is created and the burden of production then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for" its action. Ibid. If the employer meets this burden, the plaintiff must overcome the burden of proof by a preponderance of the evidence, demonstrating that the employer's "legitimate" reason was merely a pretext for discrimination. Id. at 804, 93 S. Ct. at 1825, 36 L. Ed. 2d at 679. In the context of summary judgment, to sufficiently discredit the employer's reason, and thus to survive summary judgment, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" the proffered reason that a factfinder could reasonably find it incredible. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Our Court has stated the proofs required for a disparate impact claim are based upon those required under federal law. Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 400 (2005); see also 42 U.S.C.A. § 2000e-2(k)(1). "[C]laims that stress 'disparate impact' . . . involve[] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Gerety, supra, 184

N.J. at 398 (quoting Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82 (1978)). "Rather [than proving discriminatory motive], a plaintiff must show that a facially neutral policy 'resulted in a significantly disproportionate or adverse impact on members of the affected class.'" Id. at 399 (quoting United Prop. Owners Ass'n of Belmar v. Borough of Belmar, 343 N.J. Super. 1, 47 (App. Div.), certif. denied, 170 N.J. 390 (2001)).

"The disparate impact test has been applied to hiring criteria . . . ." Rosario v. Cacace, 337 N.J. Super. 578, 587 (App. Div. 2001) (citing Griggs v. Duke Power Co., 401 U.S 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971)). The LAD "forbids the use of any employment criterion, even one neutral on its face and not intended to be discriminatory, if, in fact, the criterion causes discrimination as measured by the impact on a person or group entitled to equal opportunity." Garcia v. Gloor, 618 F.2d 264, 270 (5th Cir. 1980), cert. denied, 449 U.S. 1113, 101 S. Ct. 923, 66 L. Ed. 2d 842 (1981). See also Newark Branch, N.A.A.C.P. v. Town of Harrison, 940 F.2d 792, 798 (3d Cir. 1991) (stating "to establish a prima facie case of disparate impact discrimination, a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern"). "However, there is no disparate impact if the rule is one that

the affected employee can readily observe and nonobservance is a matter of individual preference." Garcia, supra, 618 F.2d at 270. "An adverse effect on a single employee, or even a few employees, is not sufficient to establish disparate impact." Massarsky v. Gen. Motors Corp., 706 F.2d 111, 121 (3d Cir.), cert. denied, 464 U.S. 937, 104 S. Ct. 348, 78 L. Ed. 2d 314 (1983).

State courts have relied on "the federal courts and their construction of federal laws for guidance in those circumstances in which our LAD is unclear." Victor, supra, 203 N.J. at 398. See also Wesley v. Palace Rehab. & Care Ctr., L.L.C., 3 F. Supp. 3d 221, 230 (D.N.J. 2014) ("Courts employ the Title VII evidentiary framework and standard of review when analyzing claims under the []LAD."). Discrimination based on gender stereotyping has been determined to fall within the prohibition of Title VII, which provides: "It shall be an unlawful practice for an employer -- (1) to . . . discriminate against any individual with respect to his . . . sex . . . ." 42 U.S.C.A. § 2000e-2(a)(1). See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (holding employer's failure to promote employee because she was perceived as less than feminine was illegal gender stereotyping and, a form of discrimination under Title VII). Because "Congress intended to

strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes," Price Waterhouse, supra, 490 U.S. at 251, 109 S. Ct. at 1791, 104 L. Ed. 2d at 288, the inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex, because of their gender.

Currently, the LAD prohibits discrimination based on "gender identity or expression" and "affectional or sexual orientation." N.J.S.A. 10:5-12(a). Often the terms "gender" and "sex" are used interchangeably. Prior to the statutory amendment adding "gender identification or expression, affection or sexual orientation," see L. 2006, c. 100, this court in Enriquez v. West Jersey Health Systems, 342 N.J. Super. 501, 512 (App. Div. 2001), noted the distinction between sex and gender, stating the latter encompassed "whether a person has qualities that society considers masculine or feminine." (citation and quotation marks omitted). We held the gender stereotyping was gender discrimination under the LAD. Id. at 515-16.

### C.

Another consideration is whether plaintiffs timely asserted their claims. Although the LAD contains no specific provision, it is clear "[t]he statute of limitations for claims arising under the LAD is two years." Shepherd v. Hunterdon Dev. Ctr.,

174 <u>N.J.</u> 1, 17 (2002) (citing <u>Montells v. Haynes</u>, 133 <u>N.J.</u> 282, 292 (1993)). Where only discrete acts of discrimination are alleged, the statute of limitations is easily calculated as two years from the date of the event. <u>See</u> <u>N.J.S.A.</u> 2A:14-2(a) ("Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued . . . ."). Accordingly,

> discrete acts of discrimination, such as termination or a punitive retaliatory act, are usually readily known when they occur and thus easily identified in respect of timing. Hence, their treatment for timeliness purposes is straightforward: "A discrete retaliatory or discriminatory act occurs on the day that it happens." <u>Roa v. Roa</u>, 200 <u>N.J.</u> 555, 567 (2010) (citation, internal quotation marks, and editing marks omitted). Discriminatory termination and other similar abrupt, singular adverse employment actions that are attributable to invidious discrimination, prohibited by the LAD, generally are immediately known injuries, whose two-year statute of limitations period commences on the day they occur. <u>Id.</u> at 569.

> [<u>Alexander</u>, <u>supra</u>, 204 <u>N.J.</u> at 228.]

However, if alleged conduct forming the cause of action "constitutes a series of separate acts that collectively constitute one unlawful employment practice, the entire claim may be timely if filed within two years of the date on which the last component act occurred." <u>Id.</u> at 229 (citation and internal

quotation marks omitted).  In appropriate LAD hostile workplace environment claims, the "continuing violation" doctrine, recognized under federal Title VII law, has been applied as an equitable exception to the strict application of a statute of limitations.  Ibid.; see also Shepherd, supra, 174 N.J. at 18 (discussing the equitable exception to the LAD limitations period through application of the judicially-created continuing violations doctrine).  "When an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases."  Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999).  "The premise underlying the doctrine is that the conduct becomes actionable because of its 'continuous, cumulative, synergistic nature.'"  Roa, supra, 200 N.J. at 566 (quoting Wilson, supra, 158 N.J. at 273).

To determine whether alleged incidents of discrimination constitute a continuing violation, a court should consider the following:

> (i) subject matter -- whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence -- whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

> [*Bolinger v. Bell Atl.*, 330 *N.J. Super.* 300,
> 307 (App. Div.) (quoting *Bullington v.
> United Air Lines, Inc.*, 186 *F.*3d 1301, 1310
> (10th Cir. 1999)), *certif. denied*, 165 *N.J.*
> 491 (2000).]

## III.

With these principles in mind, we consider the sufficiency of the evidence to form a prima facie cause of action alleging prohibited discriminatory conduct to survive summary judgment dismissal. In discussing the issues, we have not separately addressed plaintiffs' challenges to the factual findings made by the motion judge, but rather we have interwoven these issues among the discussion of various legal issues. Our review will also examine whether defendant correctly asserts all causes of action are barred by the two-year statute of limitations or the equitable remedies of laches and estoppel.

Generally, plaintiffs allege (1) the PAS on its face was discriminatory, in violation of the LAD, and outside the bounds of reasonable appearance standards as provided in *N.J.S.A.* 10:5-12(p); (2) the PAS weight standard imposed unlawful gender stereotyping; (3) defendant's disparate enforcement of the PAS weight standard resulted in gender bias sexual harassment; (4) the PAS weight standard had a disparate impact upon females; and (5) defendant's conduct in enforcing the PAS created a hostile work environment.

A.

Plaintiffs attack as facially discriminatory the content of the modified PAS weight standard along with other grooming and appearance requirements, such as the BorgataBabes costume. Defendant counters, arguing these claims are time-barred. Plaintiffs acknowledge their complaints were not filed within two years of the implementation of the modified PAS, but respond application of the continuing violation doctrine applies. Although raised below, the motion judge did not consider whether specific causes of action were untimely.

The modified PAS, announced on February 18, 2005, and the original standards governing costume and appearance are discrete acts, of which all BorgataBabes were notified. Plaintiffs individually acknowledged the modified PAS when a baseline weight was determined. Each signed a statement to abide by the PAS terms as an ongoing requirement of employment. As to the costume, plaintiffs auditioned in costume, making knowledge of its use a discrete act.

We reject the attempt to save the facial discrimination challenges by application of the continuing violation doctrine. Although defendant continued use of the modified PAS, as well as the costume and make-up standards, the essence of plaintiffs' as-applied claims stems from the adoption of the policy, which

27

itself led to the specific employment consequences now challenged. No new policies were adopted. The PAS was not amended to add additional restrictions; rather, PAS amendments relaxed various timeframes to return to compliance with the weight standard.

Because the adoption of the modified PAS was a discrete event with attendant permanent consequences, it triggered any then-employed BorgataBabe's awareness of the need to assert existing rights or assert a facial challenge. See Bolinger, supra, 330 N.J. Super. at 308. Consequently, the two-year statute of limitations clock began ticking either at the adoption of the PAS on February 18, 2005 or when a plaintiff was subsequently hired. Accordingly, the time to challenge the imposed weight standard or the costume as facially discriminatory, for all BorgataBabes employed when the PAS was adopted, expired on February 18, 2007. However, complaints of all BorgataBabes in defendant's employ when the PAS was modified, were filed in 2009 more than two years later.

Two plaintiffs were not BorgataBabes when the modified PAS was adopted: Williams and McDonnell. Williams had until June 13, 2008 to file, but, by waiting until January 20, 2009 to file, she also missed the limitations period to raise a facially discriminatory challenge. Only McDonnell's complaint, filed

within two years of her date of hire, timely asserted a claim the PAS was illegally discriminatory on its face; all others are time-barred.

The same analysis will not apply to plaintiffs' claims based on sexual harassment hostile work environment, disparate treatment and impact, and sexual harassment gender stereotyping, which are not confined to a discrete event. Rather these allegations comprise an ongoing course of conduct and therefore allege a continuing violation. More pointedly, although perhaps no single act rises to the level of an LAD violation, the various facts combine to form a pattern of discriminatory conduct, which cumulatively present a prima facie case showing defendant violated the LAD. In reviewing these claims, if we find prima facie evidence of an LAD violation, and one of the acts alleged occurred within two years of filing the complaint, the cause of action may not be time-barred.[7]

B.

McDonnell's complaint alleges defendant designed and enforced the PAS to have a disparate impact on female

---

[7] We reject defendant's assertion of laches as barring suit. R. 2:11-3(e)(1)(E). As to whether waiver applies, the individual facts are materially disputed. Some plaintiffs executed the modified PAS "under protest." Others were led to believe any objection would result in termination. Consequently, summary judgment on this issue is inappropriate.

BorgataBabes based on their gender and female BorgataBabes suffered disparate treatment under the policy, which was an act of gender stereotyping. She was never suspended and her position was never affected; rather, she challenges the PAS as facially discriminatory.

Whether the PAS generally and the weight standard specifically are actionable as sex discrimination requires consideration of additional legal principles. "Courts have recognized that the appearance of a company's employees may contribute greatly to the company's image and success with the public and thus that a reasonable dress or grooming code is a proper management prerogative." Craft v. Metromedia, Inc., 766 F.2d 1205, 1215 (8th Cir. 1985), cert. denied, 475 U.S. 1058, 106 S. Ct. 1285, 89 L. Ed. 2d 592 (1986). Moreover, there is no protected class based solely on one's weight.[8] The LAD addresses no such category nor does Title VII "proscribe discrimination based upon an employee's excessive weight . . . ." Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir. 2003).

The LAD addresses appearance at N.J.S.A. 10:5-12(p):

> Nothing in the provisions of this section shall affect the ability of an

---

[8]    Neither McConnell nor any other plaintiff has alleged their weight represents a physical handicap requiring accommodation, which entails a different LAD analysis. See Viscik v. Fowler Equip. Co., 173 N.J. 1, 15-16 (2002).

employer to require employees to adhere to reasonable workplace appearance, grooming and dress standards not precluded by other provisions of State or federal law, except that an employer shall allow an employee to appear, groom and dress consistent with the employee's gender identity or expression.

No reported New Jersey case has considered a challenge under this subsection of the LAD. We note other jurisdictions have reviewed allegations of discrimination by an employer's appearance standards to determine whether the challenged policies fall within an employer's imposition of reasonable appearance and grooming policies, or cross the line and violate legislative proscriptions against discrimination. The reported authority makes clear such a determination is fact-sensitive. We recite these examples as illustrative of the law's evolution, and they are not meant to be exhaustive.

In Bellissimo v. Westinghouse Electric Corporation, 764 F.2d 175, 178, 182 (3d Cir. 1985), cert. denied, 475 U.S. 1035, 106 S. Ct. 1244, 89 L. Ed. 2d 353 (1986), the court reversed a finding of sex discrimination under Title VII where the plaintiff alleged she was criticized because her attire was non-conforming to the defendant's sex-specific dress code. The court noted "[d]ress codes . . . are permissible under Title VII as long as they, like other work rules, are enforced even-handedly between men and women, even though the specific

requirements may differ." Id. at 181. Accordingly, policies need not be exactly the same for each gender, but will be considered evenhanded for the purposes of Title VII when they contain similar restrictions for both sexes. Ibid. In rejecting the plaintiff's arguments, the court stated:

> Perhaps no facet of business life is more important than a company's place in public estimation. That the image created by its employees dealing with the public when on company assignment affects its relations is so well known that we may take judicial notice of an employer's proper desire to achieve favorable acceptance.
>
> [Ibid. (quoting Fagan v. Nat'l Cash Register Co., 481 F.2d 1115, 1124-25 (D.C. Cir. 1973)).]

In Price Waterhouse, an employer's sex-based evaluation, not related to performance or ability, resulted from a decision to deny a partnership promotion to the plaintiff, a female senior manager, who was perceived as less than feminine. Price Waterhouse, supra, 490 U.S. at 258, 109 S. Ct. at 1795, 104 L. Ed. 2d at 293. The United States Supreme Court concluded a discriminatory motive affected the plaintiff's employment opportunity and represented illegal gender stereotyping, a form of discrimination under Title VII, observing:

> we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against

individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

[Id. at 251, 109 S. Ct. at 1791, 104 L. Ed. 2d at 288 (citation and internal quotation marks omitted).]

At issue in Delta Air Lines v. New York State Division of Human Rights, 229 A.D.2d 132, 134 (N.Y. App. Div. 1996), aff'd 689 N.E.2d 898 (1997), was whether the airline's use of weight standards when hiring flight attendants constituted, among other things, gender discrimination. The airline argued the height and weight standards were permissible nondiscriminatory grooming standards. Id. at 134-35. The Supreme Court of New York, Appellate Division, determined plaintiffs' challenge to the airline's weight guidelines was also not actionable as establishing sex discrimination, stating:

[I]n the matter at bar, there is no evidence in the record that Delta intended to deprive one sex of equal opportunity or treatment, or that the weight requirements were somehow applied in a discriminatory manner. In fact, Delta has submitted evidence that approximately 90% of its flight attendants are female, thereby erasing petitioners' claim that the weight charts were somehow utilized to discriminate against women, insofar as no disparate impact toward females can be shown whatsoever. Therefore, petitioners' claim of sex discrimination fails.

[Id. at 141.]

A similar Title VII challenge was presented in <u>Frank v. United Airlines, Inc.</u>, 216 <u>F.</u>3d 845, 847 (9th Cir. 2000), where the class of plaintiffs challenged the employer's use of maximum weight requirements as imposing different standards upon female flight attendants and their male counterparts. The plaintiffs argued the employer's policy was facially discriminatory and was enforced in a discriminatory manner. <u>Ibid.</u> The plaintiffs proved the weight charts addressed medium-framed women, but large-framed men. <u>Id.</u> at 854. That difference in treatment was facially discriminatory as it applied less favorable treatment to one gender over the other. <u>Ibid.</u> The sex-differentiated weight standard was determined to be invalid because it imposed unequal burdens on men and women, which was unjustified as a bona fide occupational qualification.[9] <u>Id.</u> at 855.

<u>Jespersen v. Harrah's Operating Co.</u>, 444 <u>F.</u>3d 1104 (9th Cir. 2006), addressed a plaintiff's challenge to a casino's "comprehensive uniform, appearance and grooming standards for all bartenders," which differentiated between men and women by

---

[9]    The Ninth Circuit has several reported cases reviewing facial discrimination challenges to weight restrictions under Title VII. The rationale applied in those cases mirrors that in <u>Frank</u>; that is, whether the policy on its face was less favorable and more burdensome to one gender than the other. <u>See Gerdom v. Cont'l Airlines</u>, 692 <u>F.</u>2d 602, 610 (9th Cir. 1982) (finding policy requiring only female flight attendants to comply with weight requirements violated Title VII).

prohibiting men from, but requiring women to, wear make-up. Id. at 1105, 1107. The plaintiff challenged the make-up requirement as placing an unequal burden on women and as sex stereotyping. Id. at 1106. The court held Title VII requires an employer's actions be intentionally discriminatory or have "a discriminatory effect on the basis of gender." Id. at 1108-09. Affirming the summary judgment dismissal of the plaintiff's complaint, the court concluded, "a sex-based difference in appearance standards alone, without any further showing of disparate effects," will not create a prima facie case of discriminatory treatment. Id. at 1109. The court also found the different grooming standards for men and women did not impose a more onerous standard for one gender. Id. at 1111.

Further, the court rejected the plaintiff's argument the make-up requirement was sex stereotyping, noting: "If we were to do so, we would come perilously close to holding that every grooming, apparel, or appearance requirement that an individual finds personally offensive, or in conflict with his or her own self-image, can create a triable issue of sex discrimination." Id. at 1112. See also Fountain v. Safeway Stores, Inc., 555 F.2d 753, 755-56 (9th Cir. 1977) (stating an employer's regulations, which required male and female employees to conform

to different grooming and dress standards, alone were not sex discrimination under Title VII).

A general principle gleaned from the cited authorities is: When an employer's "reasonable workplace appearance, grooming and dress standards" comply with State or federal law prohibiting discrimination, even if they contain sex-specific language, the policies do not violate Title VII, and by extension, the LAD. See Rivera v. Trump Plaza Hotel & Casino, 305 N.J. Super. 596, 602-03 (App. Div. 1997) (citing federal decisions uniformly rejecting challenges to an employer's hair length policy because hair length is not constitutionally or statutorily protected). Mindful of the objectives of achieving equal employment opportunities and removing barriers that favor an identifiable group over others, we undertake review of the fact-sensitive issue of whether the PAS discriminated against women on its face.

McConnell contends the trial judge erred in relying on subsection N.J.S.A. 10:5-12(p) as legitimizing the PAS weight standard arguing he "ignored the portion of the subsection that addresses gender identity or expression." Further, she suggests the motion judge ignored the language of subsection (a), which impacts and contours the parameters of subsection (p).

The PAS applied to both male and female associates. Although defining different but analogous general gender appearance standards, the PAS weight standard imposed the same 7% above baseline weight increase for men as for women. The policy recognized pregnancy, a gender specific condition, in the category of bona fide medical conditions representing an exception to enforcement. We find these provisions are not facially discriminatory. Unlike the weight charts in <u>Frank</u> and subsequent airline cases, the PAS did not impose a designated weight for associates of a certain height, or use differing standards to determine whether weight of males and females met defined limits. Rather, the PAS accepted an associate's baseline weight as of the date of adoption and mandated weight gain or loss must not exceed 7% of that baseline.

All plaintiffs individually expressed dislike for, or struggled to comply with, the weight standard. However, this does not demonstrate the facially neutral policy more adversely affects women than men. In addition to plaintiffs' subjective response, their evidence challenging the PAS appears to rely on sheer numbers: They argue because a disproportionately higher number of female BorgataBabes were disciplined, this proves the weight standard unequally affected women. However, such simple statistical disparities are insufficient to show the weight

standard was facially discriminatory.  See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988).

Here, no expert evidence explained how the PAS weight standard, which was neutral on its face, posed an unequal burden on one gender over the other.  Also, no proof supports the contention the PAS weight standard adversely affected female over male applicants for positions or advancement.  Further, nothing reveals defendant's reliance on a 7% increase as representing a clinically significant weight gain was erroneous or disproportionately burdensome to women.

We also cannot find the use of the differentiated costumes for male and female BorgataBabes actionable.  See Hayden v. Greensburg Cmty. Sch. Corp., 743 F.3d 569, 578 (7th Cir. 2014) (discussing federal authority governing differential grooming standards for males and females).  All associates, whether male or female, are required to wear costumes as a condition of employment; women were not singled out.  See Carroll v. Talman Fed. Sav. & Loan Ass'n of Chicago, 604 F.2d 1028, 1032-33 (7th Cir. 1979) (rejecting as discriminatory employer's policy that

women alone wear uniforms), cert. denied, 445 U.S. 929, 100 S. Ct. 1316, 63 L. Ed. 2d 762 (1980).[10]

> Although the prohibitions against discrimination in employment based on sex extend not only to hiring but to conditions and privileges of employment . . ., we do not believe that an employer unlawfully discriminates when he establishes a reasonable grooming policy which may be said to differentiate between male and female. Employers, particularly those whose business involves contact with the public should be free to express and act upon a concern with the image which their employees communicate by their appearance and demeanor.
>
> [Matter of Page Airways v. N.Y. State Div. of Human Rights, 352 N.E.2d 140, 140-41 (1976) (citations omitted).]

The record contains only photographs of the female BorgataBabes wearing the designated costume, which is form fitting, skimpy, and reminiscent of a Las Vegas-themed casino. The record states the men wore a tight-fitted club shirt and fitted pants. Although McConnell correctly asserts the BorgataBabe costume stereotypes the hour-glass figure of the female, she ignores the expressed business differentiation in the role of a BorgataBabe from other casino associates.

This is not a case similar to Equal Employment Opportunity Commission v. Sage Realty Corp., 507 F. Supp. 599, 602-04

---

[10] We need not address the BorgataBabes calendar. No evidence reflects this was mandated as part of plaintiffs' or any other associate's employment. Calendar participation was voluntary.

(S.D.N.Y. 1981), where a lobby attendant was required to wear a short, revealing outfit, resembling an American flag, to commemorate the Bicentennial. There, when the plaintiff refused to continue to wear the uniform because it provoked sexualized comments, her employment was terminated. Id. at 607. The court rejected the employer's claim the uniform fell within reasonable appearance standards, noting the lobby attendant's job was to greet and direct those who entered the building, making the sexually provocative "uniform" inappropriate to the employment task. Id. at 608-09. Here, defendant's business was to provide customers entertainment and the BorgataBabes' costumes aided the Las Vegas-style casino theme.

The record shows the BorgataBabe position comprised more than a job serving drinks and washing glasses. From its inception, an element of performance and a public appearance component was part of the described BorgataBabe position. The record does not dispute the BorgataBabes appeared as the face of the casino outside the casino floor.[11] Further, based on their designated role on behalf of defendant BorgataBabes were provided lower and more flexible hours, more beneficial earning opportunities, and perquisites of employment not extended to

---

[11] A print media pictorial feature on the BorgataBabes is included in the record.

defendant's other associates. These facts demonstrate the business specialization of the BorgataBabes among defendant's associates.

We generally agree customer preferences cannot justify discriminatory hiring or the use of stereotyping gender roles in employment positions.[12] See Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1277 (9th Cir. 1981); Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir.), cert. denied, 404 U.S. 950, 92 S. Ct. 275, 30 L. Ed. 2d 267 (1971). However, the hiring of BorgataBabes was not gender restricted and the record contains no evidence female BorgataBabes' assignments or earning ability were compromised because of their gender.

Moreover, the entertainment nature of the casino and its associates distinguishes it from a restaurant or tavern that serves customers drinks. Notably, the casino has several restaurants and cocktail lounges. Also, plaintiffs acknowledge non-PAS positions serving drinks were available in casino areas not designated for the BorgataBabe positions. As a casino, defendant's entertainment business distinguishes this matter from other cases, as the costume may lend authenticity to the intended entertainment atmosphere. See, e.g., Wilson v. S.W.

_____

[12] To the extent the trial judge's opinion suggests "expectations of the employer's patrons" may justify policies that violate the LAD, it is rejected.

Airlines Co., 517 F. Supp. 292, 302-03 (N.D. Tex. 1981) (rejecting airline's Title VII defense to policy limiting flight attendant and ticketing positions to women based on their sex appeal to attract male business travelers, reasoning the essential business of the airline was to transport their customers); Sage Realty, supra, 507 F. Supp. at 602-04 (finding sexually provocative uniform unrelated to business of lobby hostess for real estate firm violated Title VII).

We also reject plaintiffs' contention the discriminatory impact of the PAS was "obvious and self-evident." The facts in this record offer no evidence defendant's use of the weight standard or differentiated costumes deprived women employment, earning opportunities, or privileges of employment. Indisputably, the PAS reflects defendant's overemphasis on appearance, including weight. Nevertheless, that alone is not actionable as illegal discrimination under the LAD. While we understand plaintiffs' desire to require a unisex, gender-neutral costume, which eliminates all sex-based distinctions among BorgataBabes, we cannot conclude the LAD mandates this result.

We conclude on this record the evidence fails to present a cognizable claim of facial discrimination based on defendant's PAS weight policy. We cannot read the LAD to bar as

42

discriminatory an employer's appearance policy requiring an associate, representing a casino business to the public, must remain fit and within a stated weight range, such as required by the PAS. See Marks v. Nat'l Commc'ns Ass'n, 72 F. Supp. 2d 322, 330 (S.D.N.Y. 1999) (finding employer's preference for physically fit employees to have direct interaction with customers did not violate Title VII); Alam v. Reno Hilton Corp., 819 F. Supp. 905, 913-14 (D. Nev. 1993).

### C.

Plaintiffs next assert defendant discriminated against women when implementing and enforcing the PAS. Plaintiffs cite testimony some of them were told "male costumed associates . . . were not weighed"; some observed men "who gained significant amounts of weight without being subject to a weigh-in [or the] subsequent requirement to come into conformance with the PAS"; and others noted men "were able to purchase their own pants, rather than wear the Borgata costume."

Plaintiffs insist the motion judge failed to accept these facts as true for summary judgment purposes. They challenge as error his rejection of their proofs, which he characterized as anecdotal or hearsay.

Grooming policies applicable to all, but not evenhandedly enforced between men and women, may disadvantage one gender over

the other and violate the LAD. See, e.g., Marks, supra, 72 F. Supp. 2d at 330. In this matter, to prove disparate treatment, plaintiffs must provide admissible evidence showing men were treated as if exempt from the rules.

The record demonstrates all associates — male and female — were weighed when the PAS was modified to include the weight standard. Defendant's documentation records the baseline weights for employees subject to the PAS. The evidence also reveals few men were reweighed and none were disciplined.

Plaintiffs argue the motion judge erroneously failed to accord all favorable inferences to plaintiffs' testimony on this issue, which is asserted to be competent evidence of discriminatory treatment. Although plaintiffs' testimony of their own personal experiences is admissible and competent to prove a prima facie case of discrimination, statements of opinion or belief regarding male associates' experiences is not cognizable evidence to support their claims. See Cinelli v. U.S. Energy Partners, 77 F. Supp. 2d 566, 572-73, 575-76 (D.N.J. 1999) ("An issue is 'genuine' if it is supported by evidence upon which a reasonable jury could return a verdict for the non-moving party.").

Testimony relating what some men said or a plaintiff's observation of what she considered a significant weight gain by

a male is not competent proof. Nor is the fact that some men were not concerned about their weight demonstrative that these same men needed to be concerned. Plaintiffs' suggestions they never saw men weighed is refuted by defendant's documentary evidence. Even the statements that some plaintiffs saw male associates with "big bellies" lacks foundation and additional context necessary to show a violation of the PAS occurred. Further, plaintiffs offer no direct evidence from a male associate subject to the PAS explaining defendant ignored that he gained more than 7% of his baseline weight. Overall, plaintiffs' proofs alone are deficient. Absent accompanying competent proof, plaintiffs' claims of disparate enforcement of the PAS fails.

D.

The asserted hostile work environment gender stereotyping claims relate to the use of the female costume and the PAS weight standard to maintain the stereotypical image of a woman. Plaintiffs contend "the BorgataBabes are used as nothing more than sex objects by the casino, required to adhere to a stereotype of overt and aggressive feminine sexuality." Plaintiffs maintain male BorgataBabes are not sexualized or marketed in the same way as females. They rely on Jespersen to suggest the LAD prohibits an employer's policy making women

"conform to a commonly-accepted stereotypical image of what women should wear." Jespersen, supra, 444 F.3d at 1112.

First, discussing gender stereotyping, the United States Supreme Court in Price Waterhouse stated:

> In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman. In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.
>
> [Price Waterhouse, supra, 490 U.S. at 250, 109 S. Ct. at 1790-91, 104 L. Ed. 2d at 287-88.]

Second, to date, New Jersey courts reviewing gender stereotyping discrimination claims have considered harassment of plaintiffs who were thought to insufficiently exhibit traits perceived to be assigned to their gender. In Zalewski v. Overlook Hospital, 300 N.J. Super. 202, 203 (Law Div. 1996), the plaintiff was harassed by coworkers who believed he was a virgin. Characterizing "gender stereotyping" as "the assigning of certain behavior characteristics as appropriate for women and for men but not for the other sex," id. at 203 n.1, the Law Division judge concluded the LAD clearly prohibited any sexual

harassment resulting in a hostile work environment, including discrimination based on gender stereotyping. Id. at 211.

This court in Enriquez, which concerned a transsexual female, concluded "sex discrimination under the LAD includes gender discrimination so as to protect [a] plaintiff from gender stereotyping and discrimination for transforming herself from a man to a woman." Enriquez, supra, 342 N.J. Super. at 515-16. Further, "[d]istinctions must be made on the basis of merit, rather than skin color, age, sex or gender, or any other measure that obscures a person's individual humanity and worth." Id. at 526-27.

We reiterate not all sex-based differentiations are actionable and "standards that appropriately differentiate between the genders are not facially discriminatory." Jespersen, supra, 444 F.3d at 1109-10. Essentially, the law "does not demand that things that are different in fact be treated the same" or that we "pretend that there are no physiological differences between men and women." State v. Vogt, 341 N.J. Super. 407, 418 (App. Div. 2001).

We do not deny the PAS costume and physical fitness standards imposed what many would label an "archaic stereotype" of male and female physiques. Interestingly, there was disagreement among plaintiffs on the appropriateness of the

BorgataBabes costume. Some found it too revealing and offensive. Others had no complaints. However, as Jespersen and Price Waterhouse clarify, actionable conduct results when these stereotypes are shown to be accompanied by a burden on one sex over the other or are otherwise used to interfere with employment opportunities of the discriminated group. We cannot find support for the latter essential elements among the facts in this record.

Regarding the weight standard, plaintiffs claim the 7% limit imposes "a stereotype of feminine sexual appeal and sexuality of the sort envisioned [in] Jespersen" as actionable. We cannot agree with such a generalization. We have discussed the differentiated role of the BorgataBabes from other associates, and their costumes added to that distinction and defendant's entertainment setting. We cannot agree with plaintiffs that their personal reactions to the weight standard evince proven gender stereotype disparities. Overall, discipline for non-compliance with the equally applicable PAS 7% weight standard by both men and women was very rare. Defendant's evidence reflected only twenty-five of 686 women, or 3%, were disciplined, and none of the forty-six men were disciplined.

E.

The trial judge's dismissal of the alleged sexual harassment hostile work environment discrimination claims based on defendant's conduct in enforcing the weight standard of the PAS is cited as erroneous. Plaintiffs assert they suffered severe and pervasive discriminatory comments and treatment by supervisors charged with enforcing the PAS weight standard because they were women, thereby creating a hostile, intimidating, and abusive work environment. More specifically, plaintiffs allege defendant engaged in conduct that amounted to sexual stereotyping sexual harassment while enforcing the PAS.

Defendant rejects these arguments, maintaining any discipline under the PAS resulted because of plaintiffs' weight, not their sex. This general denial does not squarely meet the myriad of factual assertions of harassing conduct. The record includes evidence of several plaintiffs who experienced discriminatory interactions following pregnancies or documented medical conditions, most of which were specific only to women, in the course of enforcing the weight standard.

Following our review, we agree material factual disputes regarding harassment experienced by some plaintiffs made summary judgment dismissal of their claims unwarranted. It is important to understand that although all plaintiffs couched their

49

testimony in the context of enforcement of the PAS, the claims are not discriminatory because of weight per se, but because of a gender specific characteristic such as pregnancy or a medical condition such that the weight comments actually targeted women. In essence, but for the subjected plaintiffs' sex, they would not have been the object of the harassment.  We recite these examples:

(1) Barrella was weighed at least nine or ten times despite presenting documentation of a medical condition explaining her weight gain.

(2) Booker became pregnant with her second child and her supervisor stated she did not know whether to congratulate her, suggesting she believed Booker made up the statement to avoid a weigh-in.

(3) Kennelly was required by her shift manager Diane Hardie to wear a maternity costume in the early stages of her pregnancy, prior to any need to do so.  When she returned from maternity leave, Hardie expressed disbelief Kennelly's weight was within limits and required Kennelly to undergo a weigh-in twice during that day.

(4) B. Johnson was prescribed several medications for depression after giving birth.  Without regard for the status of her medical condition, defendant informed her she would be

A-5983-12T4

terminated upon the one-year anniversary of her child's birth if she did not comply with the weight standard. She resigned.

(5) Lopez suffered severe asthma following her child's birth for which she was prescribed several medications that impacted her weight. Despite medical documentation, she was suspended for violating the PAS weight standard. Although she was shortly reinstated, she received only partial compensation. Later, despite Lopez's medical condition, Singe Huff, Borgata's Vice President of Talent, insisted Lopez lose one pound per week. Her physician documented the health detriment she would suffer to accomplish such weight loss, which Huff rejected.

(6) Nelson was weighed despite being pregnant and was told by Hardie it was "just in case you're just getting fat and that's the real reason why you want to wear [the maternity costume]."

(7) Nouel recounted offensive comments by Jeffrey Rankin, in the presence of her shift manager Stephanie Brown that women who have children should not come back to work because they get fat.

(8) Rivera suffered a medical condition and despite returning to compliance with the PAS weight standard, was required to be reweighed every few weeks.

(9) Schiavo grieved a suspension for failing to comply with the PAS weight standard. Her medical documentation explaining post-surgery medication contributed to her weight gain was rejected.

(10) Taylor returned from maternity leave and was found out of compliance with the PAS weight standard. She produced medical documentation stating she was breastfeeding and it was "medically impossible" for her to lose weight. She was suspended when she failed to return to compliance within ninety days.

(11) Vaisyte returned from maternity leave and Brown suggested she pump out her breast milk to reach the weight standard. A subsequent weigh-in revealed she was out of compliance. She submitted a physician's note stating she was breastfeeding and told not to diet for medical reasons. After a few days, she was permitted to return to work, but was required to be reweighed every few months.

These instances are all inclusive of the facts presented to support this claim. Additional evidence reinforces similar hostile work environment allegations, unmitigated by defendant's management. Schiavo complained to Preston Patterson, the Beverage Manager, when another employee was snorting like a pig toward certain female associates; Patterson did not take action.

 A-5983-12T4

Werthmann related Patterson's comment to the BorgataBabes: "Don't anybody get pregnant.  I don't want to hear anything about anybody's family or kids."  The record shows only women suffered such harassment.  It is obvious similar comments were not directed toward men.

Several discriminatory hostile work environment LAD claims do not need proof of overt sexual conduct in the workplace. Muench v. Twp. of Haddon, 255 N.J. Super. 288, 292 (App. Div. 1992).  Harassment based on gender is sufficient.  Ibid. Although we have found enforcement of the PAS weight standard alone may not violate the LAD, the complained of conduct reflects a pattern of discriminatory comments toward women suffering medical conditions or returning from maternity leave that present a prima facie cause of action.  As Lehmann states: "discrimination itself is the harm that the LAD seeks to eradicate. . . ."  Lehmann, supra, 132 N.J. at 610 (emphasis in original).  "[I]t is the harasser's conduct, not the plaintiff's injury, that must be severe or pervasive." Ibid.  "Severity and workplace hostility are measured by surrounding circumstances." Taylor v. Metzger, 152 N.J. 490, 506 (1998).

The record evidence of management and supervisors' conduct, when viewed in a light most favorable to plaintiffs, presents a prima facie showing of harassment against women because of their

gender, which "a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment." Lehmann, supra, 132 N.J. at 603-04. Incidents not obviously based on a plaintiff's sex must be prima facie shown to be because of her sex. Ivan v. Cnty. of Middlesex, 595 F. Supp. 2d 425, 454 (D.N.J. 2009). The evidence here is adequate to create a substantial dispute of material facts that the harassment alleged was gender based, defeating summary judgment. Taylor, supra, 152 N.J. at 508.

The record also contains some evidence of reported sexual harassment by customers and sexually harassing comments and actions by other associates, which although reported, went unaddressed by supervisors. Defendant's evidence included a sexual harassment prevention policy and a hotline to make such reports. The Supreme Court recently addressed evaluation of an employer's defense to claims of sexual harassment in Aguas v. State, 220 N.J. 494 (2015). Aguas provided a framework for analyzing claims and defenses offered regarding sexual harassment hostile work environment claims. Id. at 499-500. With respect to direct claims for negligence or recklessness, the Court's discussion, anchored in Restatement [(Second) of Agency] § 219(2)(b), provided: "[A]n employer's implementation

and enforcement of an effective anti-harassment policy, or its failure to maintain such a policy, is a critical factor in determining negligence and recklessness claims under Restatement (Second) of Agency § 219(2)(b)." Aguas, supra, 220 N.J. at 499.

To prevail on a direct claim alleging defendant's negligence, a plaintiff bears the burden to show a defendant negligently created a discriminatory work environment by "faili[ng] to exercise due care with respect to sexual discrimination in the workplace, that [the defendant's] breach of the duty of care caused the plaintiff's harm, and that [plaintiff] sustained damages." Id. at 512. To defend against such a claim as discussed in Aguas, defendant may prove:

> [T]he existence of: (1) formal policies prohibiting harassment in the workplace; (2) complaint structures for employees' use, both formal and informal in nature; (3) anti-harassment training, which must be mandatory for supervisors and managers, and must be available to all employees of the organization; (4) the existence of effective sensing or monitoring mechanisms to check the trustworthiness of the policies and complaint structures; and (5) an unequivocal commitment from the highest levels of the employer that harassment would not be tolerated, and demonstration of that policy commitment by consistent practice.
>
> [Id. at 513 (quoting Gaines v. Bellino, 173 N.J. 301, 313 (2002)).]

Based on our review of the record evidence, some plaintiffs have alleged facts sufficient to demonstrate that the PAS weight

standards were enforced in a harassing manner against women because of their gender, creating a hostile work environment. Defendant's response noting accommodations were given to women fails to specifically address the alleged harassing acts. On those claims summary judgment was prematurely entered.

IV.

For the reasons discussed in our opinion, all claims challenging the PAS as discriminatory on its face were properly dismissed because they were time-barred or unsupported. As a matter of law, these challenges are not actionable under the LAD. The record also does not support discriminatory gender stereotyping by the use of sex-specific costumes or the provisions of the PAS. Further, no disparate impact is shown on these facts by the adoption of defendant's grooming and personal appearance policies. However, the record does include adequate evidence some plaintiffs' alleged facts sufficient to demonstrate defendant's enforcement of the weight policy was applied in a discriminatory harassing manner, targeting women returning from maternity and medical leave. Despite defendant's "accommodations" of these documented conditions, allegations have been presented showing the policy was used to harass these women. Collectively, the alleged acts adequately suggest a prima facie claim of sexual harassment hostile work environment.

We reverse the summary judgment dismissal of the hostile work environment claims based on the conduct surrounding the identified plaintiffs, and we remand for further proceedings. We affirm the summary judgment dismissal of all other claims for the reasons stated in our opinion.

Affirmed in part as modified. Reversed and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION