**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2299-23
                    A-2300-23
                    A-2301-23
                    A-2302-23
                    A-2303-23
                    A-2304-23
                    A-2305-23
                    A-2306-23
                    A-2307-23
                    A-2308-23
                    A-2309-23
                    A-2310-23
                    A-2311-23
                    A-2312-23
                    A-2313-23
                    A-2314-23
                    A-2315-23
                    A-2317-23

AL TABEI, SANDRA TOTH, FRANK
VIERING, MARY ROMANO, CHRIS
IRELAND, MARA KRAFT, ADEL SOLIMAN,
STEVEN MOKIENKO, RICHARD GOLDING,
SEBASTIAN DIMAEGLIO, CHRIS DESALLE,
MALGORZATA HUNTBACH, WILLIAM
SMITH, LYUBOMIR ALEKSANDROV,
MICHELLE MANCINI, PATRICK HILLARD,
MICHAEL COONEY, FREDERICK
RENZULLI, JO-ANN SCHWENDEMANN, and
GARY WEISMAN, individually for themselves
and on behalf of those similarly situated,

Plaintiffs,

and

JAMES CURRY, ROGER MONTALVO,
LYDIA BANEK, TOMAS RAMIREZ,
WILLIAM PROCEOPIO, PAUL LEBRON,
JOHN MACCHIAROLA, SHARON
MULHERN, DONALD DIVINCENZO, JAY
BERKIN, LINDA VIERECK, JERONIMO
REYES, KIM HALDEMAN, EDDISON
GIRALDO, MICHAEL SMITH, ANTHONY
VETRANO, and WENDY MCGAFFNEY,

Plaintiffs-Appellants,

v.

BALLY'S PARK PLACE, LLC, d/b/a BALLY'S
ATLANTIC CITY, JOSEPH GIUNTA, both
individually and in his management capacity,
and CORI EDLEY, both individually and in her
management capacity,

Defendants-Respondents,

and

CEOC, LLC, d/b/a CAESARS
ENTERTAINMENT CORPORATION,
BOARDWALK REGENCY, LLC, HARRAH'S
ILLINOIS, LLC, SOUTHERN ILLINOIS
RIVERBOAT/CASINO CRUISES, LLC,

Defendants.

_____

Argued January 8, 2026 – Decided January 22, 2026

2

A-2299-23

Before Judges Mawla, Marczyk, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0269-18.

Robert A. Ballard, III, argued the cause for appellants (O'Connor, Parsons, Lane & Noble, LLC, attorneys; Gregory B. Noble, Robert A. Ballard, III, R. Daniel Bause, and Debra D. Tedesco, of counsel and on the briefs).

Amy E. Rudley argued the cause for respondents (Cooper Levenson, PA, attorneys; Amy E. Rudley and Jennifer B. Barr, on the brief).

PER CURIAM

In these consolidated appeals, plaintiffs: Lydia Banek; Jay Berkin; James Curry; Donald DiVincenzo; Eddison Giraldo; Kim Haldeman; Paul Lebron; John Macchiarola; Wendy McGaffney; Roger Montalvo; Sharon Mulhern; William Proceopio; Tomas Ramirez; Jeronimo Reyes; Michael Smith; Anthony Vetrano; Linda Viereck; and Frank Viering appeal from orders dismissing their age discrimination claims under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, against defendants Bally's Park Place, LLC; Cori Edley; and Joseph Giunta. The relevant orders are dated July 18, 2023; August 22, 2023; and September 13, 2023. We affirm.

Plaintiffs are eighteen bartenders who were represented by a collective bargaining unit and employed in casinos and resorts owned by Bally's in Atlantic City. In 2015, Bally's prepared to open a new bar, called the Boardwalk Saloon, and created ten union positions with the job title "bartender entertainer."

Bally's intended the Boardwalk Saloon to become its flagship bar and generate the most revenue in the "Wild West" part of its casino. To work at one of Bally's various bars, employees had to bid on shifts approximately twice per year. Bidding was typically based on bartender seniority and certification status, with priority given to employees who had a longer tenure with Bally's. However, to bid on shifts at the Boardwalk Saloon, employees had to become "Boardwalk Saloon-certified" by satisfying a list of qualifications.

Giunta established the concept for the Boardwalk Saloon and held meetings where he, Edley, and others collaborated to create the roadmap for it that was reduced to writing in a "critical path document," which no longer exists. He conceded there were never any discussions amongst the collaborative team about whether the qualifications for the Boardwalk Saloon were discriminatory.

Edley took the lead in creating the hiring criteria for bartender entertainer positions at the Boardwalk Saloon. She was alternatively the beverage manager and regional beverage operations manager, and had supervisory authority over

plaintiffs.  Giunta was Bally's vice president of food and beverage, oversaw day-to-day business operations, established bar concepts, and reviewed Edley's hiring criteria for the bartender entertainer position.

In addition to Edley and Giunta, John Dougherty, who worked for Bally's from 2011 to 2022, helped to create the concept for the Boardwalk Saloon, and oversaw its day-to-day operations.  Rich Tartaglia was corporate counsel for Bally's from 2003 onward.  Monique Tarves was the regional labor and employee relations manager, and regional recruitment and onboarding manager from 2013 to 2020.  Jerry Beaver, who began working for Bally's around 1990, became the director of food and beverage in 2008, and oversaw its bars.

On December 24, 2015, Bally's posted an interest sheet with the Boardwalk Saloon's hiring criteria for employees to sign up if they wanted to bid on a bartender entertainer position.  Employees had to satisfy the following criteria:  complete and pass the Cicerone and BarSmarts modules/courses; complete bull riding safety training; complete choreography training; complete working flair training; wear assigned costume(s); maintain a weight proportional to their height; be able to serve food from assigned outlets; and serve as a social media ambassador.  Bally's reposted the interest sheet with these criteria on July 29 and November 26, 2016.

A-2299-23

The Cicerone course teaches about "types of craft beers, the composition of craft beers[,] and how to serve . . . and . . . describe them." Within a six-month period, Cicerone test-takers were granted two opportunities to take the exam. Edley testified Bally's informed employees interested in working at the Boardwalk Saloon that all information necessary to pass the test was available for free on the Cicerone website, which provided a full syllabus detailing the testable material.

BarSmarts is a course about wine, beer, and spirits, as well as their histories and preparation, which is then followed by a final exam. Bally's provided employees who signed up to take BarSmarts with an access code for the course, instructions on how to use the course, and an explanation on the course layout. Plaintiffs' bargaining unit requested Bally's provide plaintiffs with study guides for the Cicerone and BarSmarts courses. Bally's declined and responded the Cicerone website provides a free syllabus and study flashcards online.

Edley testified the plan for the Boardwalk Saloon was to serve cocktails, which were "a bit more involved." Bartenders were expected to be able to describe different beers and assist customers in deciding what to order, and prepare complex cocktails by making simple syrup. Bally's planned to have an

6

"extensive" craft beer menu at the Boardwalk Saloon, which included beers unavailable at Bally's other bars and restaurants aside from Guy Fieri's Chophouse, a restaurant which also required the Cicerone and BarSmarts training.

Tarves testified bartenders "would be required to ride" the mechanical bull, and Edley testified "the staff needed to understand how to ride the bull safely and . . . be able to determine if there was a safety issue prior to getting onto the mechanical bull." However, Dougherty testified he "hardly ever" saw bartender entertainers riding the mechanical bull while working at the Boardwalk Saloon. Beaver was unaware of the mechanical bull requirements and did not understand the purpose of it, as bartenders "didn't operate the bull."

Edley testified choreography training was required as bartender entertainers were intended to have a "good time" with patrons by "dancing behind the bar" and "going with the music." Working flair training was also required and involved learning how to perform tricks with bar equipment, like throwing a bottle up in the air and catching it, "throwing a tin in the air," or "[t]hrowing a napkin across a bar top so that it . . . skips like a rock." Edley testified working flair training was about "showmanship" and building a new customer base by creating a memorable experience for patrons. Dougherty

7

never saw bartenders doing choreographed dances or working flair at the Boardwalk Saloon.

Bartender entertainers were required to serve as social media ambassadors by posting on their social media accounts about events at the bar. Dougherty testified the posting was not monitored as bartenders were simply encouraged to post about the bar.

Bartenders also had to wear assigned costumes, specifically leather vests, jeans or shorts, and boots. The position also required them to serve food from specified areas.

Bartender entertainers had to maintain a weight proportionate to their height. Edley testified entertainers had to satisfy certain metrics as set forth in either: a "Body Fat Ranges for Standard Adults" table (Tanita table), which accounted for a subject's age; or a body mass index table (BMI), which did not account for age. This was to ensure employees were "physically fit to complete the[ir assigned] duties." Bally's enforced this requirement by having bartender entertainers visit an on-site nurse twice per year for measurements. If a bartender entertainer did not maintain their weight, they were "given a time period to fall within the standards," and if they still failed to do so, they were disqualified from the position.

A-2299-23

At least one employee, Richard Roman, was assessed using the Tanita table because he had failed the BMI assessment. According to Tarves, Roman was a "very fit individual," so Bally's may have used a "body fat index" to determine his eligibility.

In addition to the qualifications listed on the interest sheets, Bally's posted a job description for the bartender entertainer position, which stated employees were expected to maintain a proportionate height-to-weight ratio and "physically fit appearance." Neither the three interest sheets, nor the job description, specified a standard for measuring or ascertaining the appropriate height-to-weight ratio.

Plaintiffs' average age when the Boardwalk Saloon opened was fifty-three years old. The average age of the bartenders hired to work at the Boardwalk Saloon was thirty-three. Plaintiffs did not qualify to work at the saloon.

Count one of plaintiffs' complaint alleged age discrimination because defendants "did not hire and/or transfer plaintiffs and similarly situated older employees to a more desirable position[,] and instead[,] hired and/or transferred younger, less experienced employees based on certain discriminatory 'criteria' and for other discriminatory reasons." The second count alleged aiding and abetting, because defendants worked in concert to discriminate against them.

A-2299-23

Plaintiffs retained an expert dietician nutritionist. The expert opined "that maintenance of BMI/height proportionate to weight becomes more difficult with age," which is attributable to "age-related loss of stature, and changes in hormonal status . . . that impact body composition and metabolic rate." As a person ages, they lose height and have a harder time losing weight, which inflates their BMI and height proportionate to their weight. Also, "[a]ge-related changes in hormone status result in decreased lean body mass and increased body fat."

The expert noted Bally's BMI chart did not account for all relevant factors or adequately compensate for age-related challenges in weight maintenance. Although defendants used both the BMI and Tanita tables to assess employees of the Boardwalk Saloon, her report only accounted for the BMI standard. Using a hypothetical individual, between the ages of twenty-five and sixty-five, who maintained the same weight despite losing two inches of their height, resulted in their BMI shifting from a normal range to an overweight range. Again, the expert did not address whether, pursuant to the Tanita table, the hypothetical individual would be considered overweight.

Following discovery, defendants moved for summary judgment, asserting the record evidence did not support plaintiffs' claims. The motion judge held

A-2299-23

hearings on June 30, 2023; July 14, 2023; August 11, 2023; and August 28, 2023.

On June 30, 2023, the judge heard argument with respect to the plaintiffs who are not parties to this appeal and denied defendants summary judgment for the three plaintiffs in this first group on the disparate treatment[1] and aiding and abetting claims. However, using identical reasoning for each plaintiff, who are before us on this appeal, he granted defendants summary judgment on the disparate impact claims

> because out of thirty-one . . . remaining plaintiffs in this action, only six . . . had their BMI tested . . . . Of those six . . . plaintiffs, three . . . passed the BMI testing and the remaining qualifications to go on to work at the [s]aloon . . . . None of the [p]laintiffs were disqualified to work at the [s]aloon for failing the [b]ull [r]iding [s]afety training; the choreographed dance training; working flair training; and the social media[] . . . ambassador. Therefore, although [p]laintiffs argue that the "cumulative effect" of the qualifying criteria[] had a disparate impact upon them, they present no evidence supporting this claim.

He concluded there was not "a big enough group to claim there was disparate impact" because only three plaintiffs in the first group "out of the entire universe of Bally's employees were adversely impacted by this test."

---

[1] Although plaintiffs did not expressly plead the disparate impact or disparate treatment claims, the judge inferred those claims from the pleadings.

On July 14, 2023, the judge addressed defendants' motions for summary judgment as to three plaintiffs not participating in this appeal who passed the height-to-weight ratio requirement and were hired to work at the Boardwalk Saloon. He found they did not have disparate impact claims.

The judge then addressed the facts applicable to each plaintiff in the appeal before us when he granted defendants summary judgment on the disparate treatment and aiding and abetting claims. He found as follows:

Banek

Banek started working for Bally's in 1991 and became a bartender for the company around 1996 or 1997. Her seniority was ranked nineteenth in 2015. She was born in 1962, weighs approximately 205 pounds, and is five feet, ten inches tall.

Banek testified she passed both the BarSmarts and Cicerone tests. She was never offered bull riding training and stated her age did not prevent her from participating. Similarly, she was never offered choreography training but testified she would have signed up for it had she known about it and her age did not prevent her from participating in the training. She also testified her age did not prevent her from serving food.

12

Banek did not participate in working flair training but wanted to try it. She was willing to wear the assigned uniform, but thought the clothes were inappropriate for older people to wear. Banek agreed anyone could learn to use social media with proper training but testified she had difficulty with it due to her age. She believed she would not pass the weight and height requirements for the position. Banek never saw older people working at the Boardwalk Saloon, or any bartenders dancing or riding the mechanical bull.

The judge found Banek "did not sign up to bid into the bar because she already knew the criteria for weight; she wouldn't pass." She "did not continue with the process" to qualify for the position and "voluntarily" withdrew, as she believed she would not satisfy the height-to-weight ratio.

Montalvo

Montalvo began working for Bally's in 1989 and became a full-time bartender in 1991. He was born in 1966, is five feet, eight inches in height, and weighs about 290 pounds.

Montalvo passed both the BarSmarts and Cicerone exams after purchasing exam study guides. He did not participate in bull riding training because he had neck surgery and was concerned about potential injury. However, he never asked if he could be excused from the bull riding training.

13

Montalvo testified his age affected his ability to maintain a proportionate weight-to-height ratio, as well as participate in bull riding and choreography training. Age did not impact his ability to work as a social media ambassador or serve food. He testified neither Edley nor Giunta said anything inappropriate to him regarding his age.

The judge found Montalvo voluntarily withdrew from consideration for the Boardwalk Saloon position. Montalvo was thus not subject to an adverse employment action because he "failed to apply for the job."

Viering

Viering began working as a bartender for Bally's around 1979. In 2015, he was second in seniority. He was born in 1956, weighs 220 pounds, and is six feet, two inches tall, but was previously six feet, three inches tall.

Viering passed the BarSmarts exam. He purchased a Cicerone training course and passed the exam approximately two years after the Boardwalk Saloon opened. Viering never completed bull riding training because he had a back injury.

Viering never bid on a position at the Boardwalk Saloon because he did not take the BMI test, believing he would not pass unless he lost weight. He also testified his wife was in an accident around the time the saloon opened,

14

which "could have been a factor" why he did not want to work there. Viering was unsure whether he would have applied to work at the saloon, even if he had satisfied the employment requirements because he did not want to be stuck there for a long time in case it was "a dud."

Viering admitted his age did not prevent him from participating in choreography training, working flair training, being a social media ambassador, or wearing a costume. He was unaware of anyone utilizing working flair training at the Boardwalk Saloon and testified it had a limited craft beer selection. Viering testified the saloon's employees were given more flexibility with attendance. Neither Edley nor Giunta ever said anything inappropriate to him about his age.

The judge found Viering did not establish a prima facie age discrimination case since he did not bid on the job. Moreover, he could not ride the mechanical bull because of his back, not his age, and he neither asked for reasonable accommodation nor an exemption from the bull riding requirement.

Viereck

Viereck began working for Bally's in 2000 after it purchased the Claridge Casino, where she had worked as a bartender since 1990. She was born in 1961,

15

weighs approximately 125 pounds, is five feet, five inches in height, and met the height-to-weight proportion requirements.

Viereck passed the BarSmarts and Cicerone exams. However, due to back issues, she believed she could not ride the mechanical bull. She asked Edley if bull riding was a requirement for working at the Boardwalk Saloon and Edley responded it was. Viereck testified she could not do working flair training or carry heavy trays of food due to arthritis in her hands, but she never asked for an exemption from the requirements.

Viereck admitted her age did not preclude her from mechanical bull riding training, choreography training, serving food, or being a social media ambassador. Neither Edley nor Giunta ever said anything inappropriate to her about her age.

The judge found Viereck's back injury, not her age, prevented her from completing the bull riding training. Defendants did not discriminate against her because she never asked for reasonable accommodation and neither applied nor was qualified for the position.

A-2299-23

Macchiarola

Macchiarola began working as a bartender for Bally's in 2001. He was born in 1963, is five feet, ten inches tall, and weighs around 250 pounds. In 2015, he ranked thirtieth in seniority.

Macchiarola testified his supervisor said he was not allowed to work at the Boardwalk Saloon, and Macchiarola also believed he would be unable to work there due to his BMI because there were others who were denied employment who weighed less and had greater seniority than him. He passed the BarSmarts exam but never completed the Cicerone course or exam after he learned of the BMI requirement. Macchiarola admitted his age did not bar him from taking the exams. He also testified neither Edley nor Giunta ever spoke to him in a discriminatory manner about his age.

Macchiarola did not enroll in bull riding, flair, or choreography training. He never saw bartenders at the Boardwalk Saloon performing choreographed dances or working flair.

The motion judge found Macchiarola "willfully withdrew" from consideration for the saloon position. Defendants therefore had not taken any adverse employment action against him.

A-2299-23

McGaffney

McGaffney first worked for Bally's from 1979 to 1982 and then returned in 2006 to work as a bartender. She was born in 1960, weighs 195 pounds, and is five feet, five inches in height.

McGaffney passed the BarSmarts exam but did not take the Cicerone course and exam because she did not see the point after learning about the BMI requirements. She testified it became more difficult for her to lose weight as she aged. McGaffney stated she is "not very tech savvy" so she would have trouble with the social media requirements for the position. Neither Edley nor Giunta ever spoke to her in a discriminatory manner about her age.

The judge found "McGaffney, based on her deposition testimony, willfully withdrew from the bidding. She did not fail [the] Cicerone. She abandoned [the] Cicerone . . . ."

Reyes

Reyes began working for Bally's in 1990 and had worked as a bartender since approximately 2007. He was born in 1961. In 2015, he ranked fifty-fifth in seniority.

Reyes signed the interest sheet but never heard back and never followed up. He was concerned about the job requirements, specifically the dancing,

18

juggling, and mechanical bull operation. Reyes thought he could meet the height-to-weight requirement but was concerned he could not meet the other requirements due to his age and issues with his feet. Neither Edley nor Giunta said anything inappropriate to him about his age.

The judge concluded Reyes's testimony showed he did not bid for the position, which was fatal to his claim because a "LAD failure to hire claim requires the employee . . . to actually apply to the job." There was "no adverse employment action . . . because . . . Reyes willfully withdrew from the bidding. He also did not ask for any accommodation or an exemption [for his] . . . medical condition with his feet . . . ."

DiVincenzo

DiVincenzo began working for the Claridge in 1981, and then for Bally's after it purchased the Claridge. He was born in 1962, weighs around 200 pounds, and measures five feet, eleven inches in height. In 2015, his seniority rank was thirty-third.

DiVincenzo did not take the required tests or training programs because of the bull riding, food service, and social media requirements. He worried he would get hurt because he was "old," and spoke with his supervisors about his concerns regarding bull riding and carrying a food tray but could not recall the

19

specifics of the conversations. DiVincenzo testified he did not use social media but could learn if necessary.

Although DiVincenzo was unsure whether his weight was within a healthy range, he believed he would need to lose approximately thirty-five pounds to qualify for the position. He spoke to his supervisors about the height-to-weight requirement but again, could not recall any specifics. DiVincenzo did not recall any inappropriate comments made about his age by Bally's supervisors.

The judge found DiVincenzo's "failure to register for anything evidenced that there's no adverse employment action because he did not take any steps whatsoever to bid into the [s]aloon. He also did not ask for any accommodations or exemptions for any of the requirements."

Curry

Curry began working for Bally's in 1981, and by 2015, was ranked fourth on the seniority list. He was born in 1959, weighs around 165 pounds, and is five feet, eight inches in height.

Curry began the BarSmarts course, but neither finished the coursework nor took the exam. He also never attempted the Cicerone course or exam because he was absent from work due to illness and when he returned, he "just never followed up on it." Curry testified he could not participate in the working

flair or bull riding training, as he was susceptible to injury and had arthritis. Neither Edley nor Giunta spoke to him about his age or said anything he felt was inappropriate.

The judge found Curry abandoned his bid for a position at the saloon by "never follow[ing] up on [the] BarSmarts." Curry failed to "take the primary steps to apply to bid."

Haldeman

Haldeman began working as a server for the Claridge in 1996 and then for Bally's in 2002 after it purchased the Claridge. Around 2006, she became a bartender for Bally's. In 2015, Haldeman's seniority rank was fifty-eighth. She was born in 1967, weighs 215 pounds, and is five feet, eleven inches in height.

In 2014, Haldeman completed over half of the BarSmarts course. She took the BarSmarts course because it was required to work at Guy Fieri's restaurant. However, she did not attempt to finish the course because she was no longer interested in working at the restaurant. Although she was interested in working at the Boardwalk Saloon, she did not believe she could ride the mechanical bull or meet the height-to-weight requirements. Her name was not on the interest sheet.

Haldeman testified she did not take the Cicerone course and exam because she did not complete the BarSmarts course. She also had back issues, which prevented her from completing the bull riding training. However, she never asked for an accommodation or to be excused from the requirement. She claimed management told her numerous times she could not work at the Boardwalk Saloon, but she did not specify with whom she had spoken. Haldeman admitted Edley and Giunta never acted in a discriminatory way towards her because of her age.

The judge concluded Haldeman did not take the "primary steps to apply to bid into the [s]aloon" since she did not sign the interest sheet and "abandoned" her attempt at the BarSmarts course. Thus, defendants did not take any adverse employment actions preventing her from working at the saloon.

Smith

Smith began working for Bally's as a bartender in 2000. In 2015, he ranked forty-fifth in seniority. Smith was born in 1966, weighed around 270 pounds in 2016, and is five feet, seven inches in height.

Smith did not speak with any supervisor about the Boardwalk Saloon or its eligibility requirements. He did not enroll in either the BarSmarts or Cicerone courses because he did not believe he could satisfy the height-to-

A-2299-23

weight requirements. Smith testified his age did not prevent him from taking those courses, but it did prevent him from mechanical bull riding. The judge found Smith did not bid for the position because he failed to take the requisite courses.

Vetrano

Vetrano worked at Bally's from 1994 to 1999 and then returned as a bartender in 2002. In 2015, he was ranked forty-sixth in seniority. He was born in 1975, weighed around 175 pounds in 2016, and is five feet, eight inches tall.

Vetrano did not complete the BarSmarts or Cicerone courses and exams. He admitted his age did not prevent him from enrolling in, or completing, either course. Vetrano claimed he would have taken the BarSmarts course had his supervisors not given him the "runaround." He was "on the fence" about taking the course, and when he asked supervisors about taking it, they stated they would make it available for him but never followed through. However, he conceded neither Edley nor Giunta acted discriminatorily against him based on his age. Ultimately, Vetrano stopped asking about the BarSmarts course after he noticed coworkers with more seniority were denied work at the Boardwalk Saloon.

The judge found "Vetrano did not sign the interest sheet, so he did not receive the BarSmarts access code," which would have allowed him to take the

23

exam. Vetrano did not bid for a position at the Boardwalk Saloon because he did not take the requisite exams or "any steps to apply for the job," and so no adverse employment action had taken place.

Proceopio

Proceopio worked for Bally's from 1995 until 2018. He was born in 1942, is five feet, eleven inches tall, and weighed around 240 pounds in 2016. He ranked twenty-fifth in seniority in 2015.

Proceopio testified he never saw, and therefore never signed, the interest sheet for the saloon. He took neither the BarSmarts nor Cicerone courses and exams. Proceopio did not enroll in the bull riding training because he: believed he was too old; had "no desire to ride a bull;" and was "never asked" to participate. He stated the opening of the Boardwalk Saloon limited his ability to work at another Bally's bar.

Proceopio tried to speak with Edley about the Boardwalk Saloon. However, he could not remember when the conversation took place or what was said. He admitted neither Edley nor Giunta ever said anything discriminatory to him about his age, but Giunta had been rude to him before.

A-2299-23

The motion judge found Proceopio was not qualified to work at the Boardwalk Saloon. He never took any steps to apply for the job because he neither signed the interest sheet nor took the BarSmarts and Cicerone courses.

Ramirez

Ramirez worked for Bally's as a bartender from 1994 until 2017. He was born in 1953, is five feet, eight inches in height, and weighs approximately 175 pounds. In 2015, his seniority rank was twenty-two.

Ramirez testified he "didn't care" to enroll in the Cicerone course and exam after he noticed other older employees had issues with it, and thought his age prevented him from meeting the position's requirements. He did not know what the BarSmarts course and exam was, so he did not attempt it.

Ramirez told a supervisor he had a back problem, which prevented him from riding the mechanical bull, but he could not remember with whom he had spoken. His age made it challenging to maintain his weight in proportion to his height, participate in bull riding, and engage in working flair training. He admitted neither Edley nor Giunta ever said anything discriminatory to him about his age.

The judge found Ramirez took no steps to apply for a position at the Boardwalk Saloon. This was evidenced by the fact he never took the BarSmarts or Cicerone courses.

Mulhern

Mulhern began working for Bally's as a bartender in 2002. She was born in 1962, is five feet, five inches in height, and weighed around 140 pounds in 2016. Her seniority rank was thirty-second in 2015.

Mulhern took neither the BarSmarts nor Cicerone courses or exams, and she did not sign the interest sheet because of the bull riding requirement and her belief she would not satisfy the BMI requirement. She "didn't want to put [her]self through" getting assessed for the height-to-weight requirement because it was "embarrassing . . . for a woman." Mulhern never addressed her concerns about the height-to-weight ratio requirement with her supervisors.

Mulhern recalled a comment Edley made about her slow work pace, which she interpreted as a comment on her age. Beyond that, she admitted neither Edley nor Giunta said anything to her specifically about her age. Mulhern testified she often spoke with younger bartenders who knew nothing about the tests required to work at the Boardwalk Saloon. She testified saloon bartenders do not have to ride the mechanical bull.

A-2299-23

The motion judge concluded defendants did not take any adverse employment action against Mulhern. She did not take the requisite courses or steps to apply for the position and did not seek an accommodation for the bull riding requirement.

Lebron

Lebron worked as a bartender at Bally's from 1997 until 2018. In 2015, he ranked twenty-seventh in seniority. He is five feet, ten inches in height, was born in 1968, and weighed 220 pounds in 2016.

Lebron did not take the BarSmarts or Cicerone courses and exams because of computer-access issues and he "didn't have a lot of time to do it." He did not complete any of the requirements to work at the Boardwalk Saloon and did not bid for any shifts. Lebron testified he could not participate in bull riding and lacked hand-eye coordination for flair training because of his age. He was active on Instagram and could have learned to post online as a social media ambassador. Neither Edley nor Giunta ever spoke to him in a discriminatory way about his age.

The judge found Bally's did not take any adverse employment action against Lebron. This was because he took no steps to apply for the Boardwalk Saloon position.

A-2299-23

Giraldo

Giraldo began working at Bally's in 2013. In 2015, his seniority number was sixty-five. He was born in 1971, weighed around 182 pounds in 2016, and is approximately five feet, seven inches in height.

Giraldo was unsure if he finished the BarSmarts course or exam, and he did not take the Cicerone course and exam. He did not know about the interest sheet for the Boardwalk Saloon, so he never signed it. Giraldo testified his age prevented him from participating in the bull riding safety training but did not prevent him from taking the BarSmarts or Cicerone exams. Neither Edley nor Giunta ever spoke to him in a discriminatory way about his age.

The motion judge found Giraldo did not apply to work at the Boardwalk Saloon since he did not sign the interest sheet or take the requisite courses. As a result, Bally's did not take any adverse employment action against him.

Berkin

Berkin became a bartender for Bally's in 2002 after it purchased the Claridge, where he had been working since 1985. He was born in 1962, weighs around 170 pounds, and is five feet, eleven inches in height. His seniority rank was thirty-eighth.

A-2299-23

Berkin did not sign the interest sheet to work at the Boardwalk Saloon and did not take the BarSmarts or Cicerone courses and exams because he thought he would not qualify after comparing himself to coworkers who were denied positions. He also did not participate in the bull riding training because of concerns over his age and risk of injury to his back.

Berkin admitted his age would not prevent him from taking the BarSmarts or Cicerone courses, participating in choreography training, working flair training, wearing the Boardwalk Saloon uniform, serving food, or working as a social media ambassador. He testified neither Edley nor Giunta said anything inappropriate to him or acted discriminatorily towards him because of his age.

The judge concluded Bally's did not take adverse employment action against Berkin because he failed to apply for the position since he neither signed the interest sheet nor took the requisite courses.

I.

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent

evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540).

"Summary judgment should be granted, in particular, 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman, 242 N.J. at 472 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "If there is no genuine issue of material fact, [the court] must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig.

Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)).

A party opposing summary judgment must provide evidence "beyond mere 'speculation' and 'fanciful arguments.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Hoffman v. Asseenontv.com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009)). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005). "If the evidence [submitted by the non-movant] is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). Thus, bare conclusions, "without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment." Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999) (quoting U.S. Pipe & Foundry Co. v. Am. Arb. Ass'n, 67 N.J. Super. 384, 399-400 (App. Div. 1961)).

We review the trial court's grant or denial "of a motion for summary judgment de novo, applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). On de novo review, "[a] trial court's interpretation of the law and the legal consequences that flow from established

31

facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

II.

Plaintiffs contend the requirements for the bartender entertainer positions "instituted per se discriminatory qualifications without justification." They maintain defendants readily violated the LAD because the qualifications caused disparate treatment and had an unlawful disparate impact on a distinctly older group of employees.

Plaintiffs argue defendants' loss of the critical path document used to formulate the operation and goals of the Boardwalk Saloon "only lends to the argument that the qualifications were manifested for an improper purpose." They claim the document was evidence of "some discriminatory purpose."

Plaintiffs assert the bartender entertainer qualifications are facially discriminatory and evince a discriminatory purpose. The weight-to-height proportionality requirement was ageist because plaintiffs' expert explained BMI weight-to-height proportions were difficult to maintain with age. This was corroborated by plaintiffs' testimony regarding these physiological issues.

A-2299-23

Plaintiffs point out defendants used charts containing body fat ranges adjusted for age, despite basing their decisions on the BMI chart, which does not adjust for age. Therefore, defendants did not level the playing field for older employees. Although defendants claimed they made an exception in Roman's case, the evidence they presented was only anecdotal and no other evidence was provided to show an exception was made for others, or that defendants codified the exception into policy.

Plaintiffs argue the disparate discriminatory effects caused by defendants' weight-to-height requirements are evidenced by the age disparity between the employees who qualified to work in the saloon versus those who did not. Defendants' other requirements, including the bull riding, choreography, and working flair trainings, as well as the social media ambassador requirement, were cumulatively discriminatory because they "were extremely prohibitive based upon age."

Defendants also lacked a business necessity for imposing the requirements to work at the saloon. This was evidenced by the fact that the weight-to-height ratio was discontinued in 2022. One manager even noted the requirement had no impact on bartenders' abilities.

A-2299-23

The exam qualification was unnecessary because younger bartenders were permitted to work without passing the exams, whereas others were held to the test-taking requirements and often not given enough time to complete the exams. Plaintiffs point out there was no need for the exams because other bars in the casino served the same drinks as the Boardwalk Saloon.

Plaintiff's further assert the bull riding requirement was unnecessary because the evidence showed saloon bartenders did not manage or operate the bull. Likewise, there was no business justification for the choreography because two employees testified they never saw saloon bartenders dance. And the social media ambassador requirement was unnecessary because no bartender was required to post on social media and defendants never monitored the posts.

Plaintiffs also claim summary judgment was improper because defendants made discriminatory statements to various workers. They assert Edley told an older female employee "she must wear 'age-appropriate' shorts while at the bar, meaning . . . [defendants] did not want to see her in shorter shorts because she was older." Edley also commented about employees being slow for their age, laughed at an older employee who asked about working at the saloon, and stated he "wouldn't be one of those to work that bar."

34

The LAD prohibits employers, "because of . . . age, . . . [from] refus[ing] to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age."  N.J.S.A. 10:5-12(a).  The law is construed liberally because "the overarching goal of [the] LAD [is] to eliminate the cancer of discrimination."  Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002); see N.J.S.A. 10:5-3.

Discrimination claims are examined under the McDonnell Douglas[2] framework, which requires plaintiffs to establish a prima facie discrimination claim.  Viscik, 173 N.J. at 13-14.  Prima facie discrimination exists when:  "(1) complainant was a member of a class protected by the [LAD]; (2) complainant was qualified for the position or rank sought; (3) complainant was denied promotion; and (4) others with similar or lesser qualifications achieved the rank or position."  Chou v. Rutgers, The State Univ., 283 N.J. Super. 524, 538 (App. Div. 1995); see also Dixon v. Rutgers, The State Univ., 110 N.J. 432, 443 (1988).  "The evidentiary burden at the prima facie stage is 'rather modest'" and "is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence."  Zive v. Stanley

---

[2]  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Roberts, Inc., 182 N.J. 436, 447-48 (2005) (italicization omitted) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).

The LAD recognizes both disparate impact and disparate treatment claims. Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 398 (2005). Disparate impact claims "involve[] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82 (1978) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). Proof of discriminatory motive is not required. Ibid. Instead, a plaintiff must demonstrate the facially neutral policy "resulted in a significantly disproportionate or adverse impact on members of the affected class." United Prop. Owners Ass'n of Belmar v. Borough of Belmar, 343 N.J. Super. 1, 47 (App. Div. 2001); see Gerety, 184 N.J. at 399. A plaintiff must show an adverse impact on more than one employee, "or even a few employees." Massarsky v. Gen. Motors Corp., 706 F.2d 111, 121 (3d Cir. 1983); see also Schiavo v. Marina Dist. Dev. Co., LLC, 442 N.J. Super. 346, 369-70 (App. Div. 2015).

Hiring criteria claims are examined like failure to hire or promote claims. See Victor v. State, 203 N.J. 383, 408-09 (2010). They require some action by

employees to qualify for a position and then the employer to take adverse employment action against the employee. See id. at 409-12; Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 348-49 (1997) (holding the employee-plaintiff satisfied the prima facie requirement to show age discrimination because he was terminated from his position); cf. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 617 (1993) ("For the remedial purpose of the LAD to be fulfilled, the employer must take action, because generally the employer is the party with the power and responsibility to hire, promote, reinstate, provide back pay, and take other remedial action." (Emphasis added)). A plaintiff must "show . . . the prohibited consideration[, age,] played a role in the decision making process and . . . had a determinative influence on the outcome of th[e] process." Maiorino, 302 N.J. Super. at 344 (alteration in original) (quoting Miller v. Cigna Corp., 47 F.3d 586, 597 (3d Cir. 1995)).

Weight and height are not protected classes. See Schiavo, 442 N.J. Super. at 380-81. Additionally, when requirements are uniformly applied discrimination is not established. See Carroll v. Talman Fed. Sav. & Loan Ass'n of Chi., 604 F.2d 1028, 1032-33 (7th Cir. 1979).

Here, under the first McDonnell Douglas prong, plaintiffs are clearly members of a protected class based on their age. Likewise, plaintiffs have met

37

the fourth prong, because there is evidence showing younger, less-qualified workers were hired at the Boardwalk Saloon.

However, as the motion judge found, there is no evidence to support the second McDonnell Douglas prong because no plaintiffs ever completed the application process, and there is no objective evidence showing they were qualified to work at the saloon. As a result, there was no evidence to support the third prong as well because defendants did not have the opportunity to take adverse employment action, which would have evinced plaintiffs' claims age was used in the decision-making process. See Maiorino, 302 N.J. Super. at 347-48.

Even if the second prong was met, plaintiffs must show a "significantly disproportionate or adverse impact" on more than a few individuals. Gerety, 184 N.J. at 399; see Massarsky, 706 F.2d at 120-21. Plaintiffs clearly constitute more than a few individuals. However, the record lacks evidence of the impact of defendants' requirements on non-plaintiff employees, to show a prima facie disparate impact. See Gerety, 184 N.J. at 404-06.

## III.

Plaintiffs contend their disparate treatment claims should have survived summary judgment because defendants' requirements to work at the Boardwalk

Saloon were pretextual. Despite their health histories, plaintiffs assert there was no evidence of performance issues or subpar bartending qualifications since the drinks at all Bally's bars were the same. They reiterate there were bartenders who did not pass the exams who were allowed to work at the saloon. One server was not certified as a bartender but still worked as one. Edley also allegedly bartended, despite not being certified. Therefore, the judge's finding plaintiffs were not qualified to work at the saloon because they did not apply or complete the qualification process was error because it ignored the fact the requirements were discriminatory and prevented them from bidding to work at the saloon.

A plaintiff may establish a disparate treatment claim under the LAD when "[t]he employer simply treats some people less favorably than others" because of their protected class. Gerety, 184 N.J. at 398 (quoting Peper, 77 N.J. at 81). "Proof of discriminatory motive is critical" to a disparate treatment claim. Peper, 77 N.J. at 81 (quoting Int'l Bhd. of Teamsters, 431 U.S. at 335 n.15). Mere evidence of being passed over for promotions or new roles is insufficient unless "a more persuasive showing [is] made that the decision not to promote . . . was based upon something other than a bona fide evaluation of [an employee's] qualifications for the position." Id. at 86 (italicization omitted).

A-2299-23

In Peper, an employee claimed discrimination based on not being promoted when other employees, who were employed by the defendant for shorter amounts of time, were promoted. 77 N.J. at 62-63. However, the employee resigned before the position she wanted was available. Id. at 64. The Court noted because the employee prematurely resigned, "she was not in a position to be considered for that job." Id. at 87. Therefore, the employee did not meet the burden of showing disparate treatment. Ibid.

Plaintiffs' disparate treatment claims were properly dismissed because the record lacks evidence of a discriminatory motive regarding the hiring decisions at the Boardwalk Saloon, as plaintiffs were not qualified to work at the bar and never applied for the position. Put differently, defendants did not have the opportunity to discriminate by rejecting plaintiffs based on their age. See Raspa v. Off. of Sheriff of Gloucester, 191 N.J. 323, 327 (2007) (holding an employee must have bona fide qualifications for the role sought to trigger an employer's obligations under a reasonable accommodation claim). Like Peper, plaintiffs here, having never applied, were not "in a position to be considered for [the] job." 77 N.J. at 87.

IV.

Finally, plaintiffs argue it was error to dismiss their aiding and abetting claims because Bally's engaged in discrimination, and Edley and Giunta, as managers, knowingly and substantially assisted Bally's in its unlawful conduct. We are unconvinced.

N.J.S.A. 10:5-12(e) prohibits "any person, whether an employer or an employee or not, to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." Aiding and abetting liability requires a plaintiff to show "active and purposeful conduct." Tarr v. Ciasulli, 181 N.J. 70, 83 (2004). Specifically: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [their] role as part of an overall illegal or tortious activity at the time that [they] provide[] the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." Id. at 84 (fourth alteration in original) (quoting Hurley v. Atl. City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999)).

In Cowher v. Carson & Roberts, the plaintiff was a truck driver employed by the defendant and, while not Jewish himself, was offended by antisemitic slurs made by two supervisors in the office. 425 N.J. Super. 285, 291-92 (App.

41

Div. 2012). The plaintiff filed a claim of religious discrimination against the defendant and his supervisors for aiding and abetting the other supervisor because the supervisors did not "restrain" each other. Id. at 291-92, 304. We concluded there was sufficient evidence for a jury to find aiding and abetting under N.J.S.A. 10:5-12(e), because the supervisors should have known their actions violated company policy and, viewing the facts in the light most favorable to the plaintiff, there was evidence the supervisors' conduct "fed off each other." Id. at 304.

In Tarr, the plaintiff sued her employer and the owner of the company for sexual harassment and discrimination. 181 N.J. at 73-74. The Supreme Court found insufficient evidence the owner was individually liable because he did not encourage the discriminatory behavior, was not present when the wrongful acts occurred, and at most, was negligent in monitoring his employees. Id. at 84-85.

The motion judge here carefully considered the facts as they related to the aiding and abetting claims alleged by each plaintiff. As we recounted with each plaintiff, there was no evidence of aiding or abetting by Edley and Giunta. Indeed, no evidence exists that Edley or Giunta made remarks or took actions remotely colorable as active and purposeful conduct to assist Bally's in

committing age discrimination, or that they "fed off each other" by engaging in discriminatory conduct on behalf of Bally's.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2299-23